Daphne **STRICKLAND**, et al.,
**Plaintiffs–Appellants,**

v.

**TACO BELL CORPORATION,** et al., **Defendants–Respondents.**

No. 61480.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 2, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 10, 1993.

Application to Transfer Denied
April 20, 1993.

Brandenburg, Kaveney & Lownsdale, James E. Lownsdale, St. Louis, for plaintiffs-appellants.

Newman, Goldfarb, Freyman & Stevens, P.C., Mayer S. Klein, St. Louis, for defendants-respondents.

PUDLOWSKI, Judge.

Plaintiffs Jenifer, Victoria, and David Strickland, the natural children of Michael Strickland, through their mother and next friend, Daphne Strickland, appeal from a summary judgment entered by the Circuit Court of the City of St. Louis for defendant-respondent, Taco Bell Corporation. Appellants' father, Michael Strickland, died from complications to injuries sustained after falling down on the premises at one of respondent's restaurants. Before the case went to trial, defendants filed a motion for summary judgment. On January 10, 1992, the motion was sustained.

Appellants now appeal claiming the trial court erred in granting summary judgment asserting, when viewed in the light most favorable to the plaintiff, the record supports appellants' theories of negligence. For their second point, appellants claim that genuine disputes of material fact exist which should have precluded the trial court's entry of summary judgment for respondent. Appellants' final point contests the form of respondent's summary judgment motion, stating that it was, among other things, conclusory. We reverse in part and affirm in part.

## I. *Facts*

On the night of July 15, 1988, Michael Strickland (Decedent) went to the Big Apple Club in Manchester where he met a coworker. Decedent spent the evening drinking and dancing. After the club closed at 1:30 a.m., Decedent walked across the parking lot to a Taco Bell, entered the restaurant and ordered two burrito supremes from the restaurant's night manager, Steven Faulkner (Manager). Decedent received the burritos and exited the restaurant.

At approximately 2:00 a.m. on the morning of July 16, two female patrons entered the restaurant and informed Manager that a large man was leaning against the exterior wall of the building. Manager exited the restaurant through the front door and observed a large African–American man approximately six feet six inches tall leaning against the front wall of the Taco Bell. Manager recognized the man as Decedent who had ordered two burritos from him a half hour earlier. Manager observed that Decedent had apparently regurgitated his two burrito supremes and that some of the food matter stained Decedent's shirt.

Manager described Decedent as he leaned against the wall as "glassy eyed" and "not totally in the here and now." Manager asked Decedent whether he needed anything. Decedent did not respond to his inquiry. As Manager stood with Decedent in front of the restaurant, Decedent began to slowly slide down the wall from a standing position until he was on his haunches. Decedent then listed to one side and eventually toppled over. Manager assisted Decedent into a sitting position and left him. Manager re-entered the restaurant in order to serve drive-up customers who were part of the "bar rush" at 2:00 a.m.

There is no evidence of Decedent's activities from 2:00 a.m. until about 3:45 a.m. when Moreese Strong drove up and parked his car in the Taco Bell parking lot. Strong was married to a Taco Bell employee, and he was waiting for her to go off duty. Strong noticed Decedent, who had regained a standing position, leaning against the exterior wall of respondent corporation's restaurant. Decedent's eyes were closed as he leaned against the wall. As Strong waited for his wife, he witnessed Decedent begin to lean to his left. Decedent's leftward movement continued, and he fell to the pavement. Strong stated that Decedent did not break his fall with his arms but rather Decedent's shoulder hit the

pavement, violently jarring his head. Strong signalled to the workers in the Taco Bell to come out. Manager emerged from the restaurant and saw Decedent lying on the pavement. The pavement was damp around the area of Decedent's fall.

It is uncertain whether Decedent asked Strong for assistance in getting up. Nevertheless, Manager and Strong, who were both much smaller than Decedent, stood on either side of Decedent and moved him to a nearby cement patio table. The two men carried Decedent to a bench beside the patio table and placed Decedent's arms on the table. Decedent's head came to rest on his hands which were on the table. While Decedent was assisted by Manager and Strong from the pavement to the bench he was unable to support his entire weight, although his conversation with Manager and Strong indicated that he was conscious.

Manager asked Decedent if he could call an ambulance or the police. Decedent said that he did not want the police called but gave Manager a number to call. Manager dialed the number at least once and received no answer.

Manager and Strong abandoned Decedent on the patio bench. Strong departed with his wife around 4:15 a.m. When he left, Decedent was still on the bench. Manager departed the premises around 4:15 a.m. Manager checked on Decedent before he left, and observed that Decedent was making a snoring noise. Decedent was still on the bench when both departed.

Marie Bobb, the day manager, arrived at Taco Bell the next morning and discovered Decedent lying on the pavement beside the patio bench on which he had been sleeping the night before. She called the police. Two police officers responded, and two paramedics were called to the scene soon after the police arrived. When the paramedics arrived they noticed Decedent's head was propped up on the leg of one of the police officers. The paramedics observed Decedent situated on the pavement in a position that was indicative of paralysis. They administered a series of tests which confirmed their suspicions and immobilized Decedent who stated he had no feeling below his upper chest. Decedent had an abrasion on his head. Later it was determined that Decedent had fractured a cervical vertebrae which left him a quadriplegic. Decedent lived for eight weeks in the hospital. Decedent's death certificate indicated the cause of death was complications from a fracture of the cervical vertebrae.

It was respondent corporation's policy during the period of time in question to serve intoxicated patrons in its restaurants, and Manager stated in his deposition that nine out of ten customers who enter a Taco Bell after 11:00 p.m. on any night are intoxicated. Respondent also had a policy of assisting injured people on its premises which was interpreted by Manager to mean calling 911 if an injury did occur. Marie Bobb, the day manager of the Taco Bell, understood respondents Corporation's policy to be one in which a potentially injured party was asked if they needed help, and if the party requested aid, assistance was called. In a document entitled *"Taco Bell.* RESTAURANT TEN BASIC SAFETY RULES," rule number five directed employees to "REPORT ALL INJURIES. GET FIRST AID IMMEDIATELY." The direction at the bottom of the safety rules stated that they were to be posted in a conspicuous place. In the "First Aid" chapter of respondent Corporation's administrative reference manual, there are several guidelines for first aid preparedness and procedure. In a manual section designated "Training Employees," the first aid objective emphasized is the acronym "PLAN." The four basic rules are: (1) Protect employee/customer from further injury or aggravated illness by avoiding unnecessary movement; (2) Let others call for help and provide transportation; (3) Assist victim immediately; (4) Notify your supervisor.

Additional facts will be developed as necessary.

## II. *Form of Summary Judgment Motion*

Appellants contest the sufficiency of respondents' summary judgment motion, and respondents contest in their brief the timeliness of appellants' suggestions in opposi-

tion to respondents' summary judgment motion. Appellants complain that the affidavit filed by respondent in support of its motion for summary judgment is conclusory and as such, will not support a motion for summary judgment. A review of respondent's motion along with their supporting affidavit indicates that it is sufficiently particular. The affidavit in support of respondent's motion is based on personal knowledge and was properly before the court.

■ Respondent suggests that summary judgment was properly granted because respondent's affidavit was unopposed in that appellants' affidavit was not filed in a timely fashion. The record indicates otherwise. Appellants' affidavit was filed on January 9, 1992, one day before the summary judgment motion was heard by the trial court. "Prior to the day of the hearing the adverse party may serve opposing affidavits." Rule 74.04(c). The rule is clear that the affidavit of the party opposing summary judgment may be served at any time prior to the date of the hearing. Respondents' contention is without merit.

### III. *Summary Judgment*

■ When reviewing a ruling on a motion for summary judgment an appellate court scrutinizes the record in the light most favorable to the party opposing the motion. *Gast v. Ebert*, 739 S.W.2d 545, 546 (Mo. banc 1987). The party opposing the motion receives the benefit of all favorable inferences to be drawn from the evidence. *Id.* Rule 74.04(c) permits summary judgment only when there is no genuine issue of material fact and places the burden of persuasion on the moving party to demonstrate a lack of genuine issues. *Germania Bank v. Thomas*, 810 S.W.2d 102, 105 (Mo. App.1991). A fact is material if it is "of such legal probative force as would control or determine the litigation." *Id.* (quoting *Ware v. St. Louis Car Co.*, 384 S.W.2d 287, 290 (Mo.App.1964)). In order to determine the propriety of a summary judgment, we review the entire record before the trial court, including pleadings, depositions, admissions and exhibits and must conclude that the moving party was entitled to a judgment as a matter of law. *Id.* Since the deletion of subsection (h) from Rule 74.04, it is no longer necessary for the moving party to support a motion for summary judgment by unassailable proof. *Union Mutual Ins. Co. v. Brown*, 809 S.W.2d 144, 145 (Mo.App.1991).[1]

■ In an action for negligence, the plaintiff must establish the existence of a duty on the part of the defendant to protect the plaintiff from injury, breach of the duty, and that defendant's breach proximately caused plaintiff's injury. *Krause v. U.S. Truck Co., Inc.*, 787 S.W.2d 708, 710 (Mo. banc 1990). Unique among the elements of negligence is duty because the existence of a duty is a question of law. Prosser states:

> The existence of a duty. In other words, whether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other-or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be deter-

---

1. The former standard for summary judgment provided that a genuine issue of material fact existed if there was the slightest doubt about a fact. *See, e.g., Ebert*, 739 S.W.2d at 546; *West v. Jacobs*, 790 S.W.2d 475, 479 (Mo.App.1990); *Roberson v. Beeman*, 790 S.W.2d 948, 950 (Mo.App. 1990). This notion was based on the since deleted phrase in the Supreme Court Rules that a summary judgment motion be supported by "unassailable proof." With the deletion of the phrase unassailable proof from the Rules, Missouri courts have liberalized summary judgment in that they grant it more readily. The motion is no longer disfavored as it once was. Instead, summary judgment is viewed as a means of relieving the courts of baseless litigation and saving the litigants time, money, and frustration. *See Wood & Huston Bank v. Malan*, 815 S.W.2d 454 (Mo.App.1991). Under the new more flexible standard, a genuine dispute over a material fact rather than a scintilla of evidence creating only the slightest doubt is necessary. *See id.* However, the old summary judgment standard was deeply entrenched and on occasion courts still entertain the unassailable proof standard. *See, e.g., Board of Architects v. Earth Resources*, 820 S.W.2d 505, 513 (Mo.App.1991) (Berrey, P.J. dissenting).

mined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court.... A decision by the court that, upon any version of the facts, there is no duty, must necessarily result in judgment for the defendant. A decision that, if certain facts are found to be true, a duty exists, leaves open the other questions [of fact] now under consideration.

William L. Prosser, *Law of Torts* § 36 (3d ed. 1964). The duty to exercise reasonable care may be a duty imposed by a court under the circumstances of a given case based upon what the tortfeasor knew or should have known. *See Hoover's Dairy, Inc. v. Mid–America Dairymen*, 700 S.W.2d 426, 431 (Mo. banc 1985); *Zuber v. Clark Construction Co.*, 251 S.W.2d 52, 55 (Mo.1952). A duty may also be imposed by the legislature or the common law based upon a relationship between the parties. The determination of whether a duty will be imposed rests upon several policy factors including: (1) the social consensus that the interest is worthy of protection; (2) the foreseeability of harm and the degree of certainty that the protected person suffered injury; (3) the moral blame society attaches to the conduct; (4) the prevention of future harm; (5) considerations of cost and the ability to spread the risk of loss; and (6) the economic burden on the actor and the community. *Hoover's Dairy*, 700 S.W.2d at 432; *Hyde v. City of Columbia*, 637 S.W.2d 251, 257 (Mo.App.1982), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

 In 1969, the Missouri Supreme Court adopted section 323 from the Restatement (Second) of Torts which imposes a duty on those who voluntarily or for consideration render services to another.

*Stanturf v. Sipes*, 447 S.W.2d 558, 561–62 (Mo.1969). This section provides:

**§ 323. Negligent Performance of Undertaking to Render Services**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Under this section, a duty of care is imposed upon the actor independent of the actor's actual or constructive knowledge, however, knowledge is still important in defining the scope of the standard of care owed. *Hoover's Dairy*, 700 S.W.2d at 433; *Stanturf*, 447 S.W.2d at 561. Apart from the Restatement section, Missouri case law supports the proposition that one who acts gratuitously or otherwise is liable for the negligent performance of an act, even though there was no duty to act originally. *Brown v. Michigan Millers Mut. Ins. Co., Inc.*, 665 S.W.2d 630, 634 (Mo.App.1983); *Rossmann v. G.F.C. Corp. of Missouri*, 596 S.W.2d 469, 473 (Mo.App.1980); *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18, 23 (Mo.1953); *Berry v. Emery, Bird, Thayer Dry Goods Co.*, 357 Mo. 808, 819, 211 S.W.2d 35, 41 (1948).

 In the instant case, Manager performed several affirmative acts to aid Decedent. Because of the procedural posture of this case, we accept as true, but do not rule, that Manager was on duty and acting within the scope of his employment for respondent corporation when he acted on behalf of Decedent.[2] Manager first at-

---

**2.** Respondent corporation argues that Manager voluntarily assumed a duty toward Decedent, and as such a cause of action cannot be maintained against respondent corporation. Without deciding the issue, we note that "[w]hether an act is within the 'scope of employment' or 'scope of duty' is not measured by the time or motive of the act, but whether it was done by virtue of the employment and in furtherance of the business interests of the 'employer.'" *Maryland Gas Co. v. Hughes*, 728 S.W.2d 574, 579 (Mo.App.1987). The principle applies when an employee is actually engaged in carrying out his employer's business. *Id.* Once an employer/employee relationship has been established, the employer will be held liable for the torts of his employee, so long as the employee was performing the acts within the scope of his employ-

tempted to assist Decedent at 2:00 a.m. At that time, Manager propped Decedent up into a sitting position. When he was distracted by a rush at the drive through window, he left Decedent in a sitting position. Later at 3:45 a.m., when beckoned by Strong, Manager again assisted Decedent. Manager asked Decedent whether an ambulance or the police should be called and, upon Decedent's rejection of those two alternatives, called a phone number which Decedent provided. Manager and Strong physically moved Decedent from the position on the pavement by the exterior wall to a patio bench where they slumped Decedent over a table. Having performed these acts, Manager abandoned Decedent on the patio bench. At some point during the night, Decedent fell from the bench, and he was found the next morning laying on the pavement.

From the facts presented in the record on appeal, we cannot conclude, as a matter of law, that Manager did not voluntarily assume a duty toward Decedent. We hold that the question of duty has not been conclusively resolved against appellants, and under these circumstances, a remand is proper.

In addition to the affirmative acts taken by Manager on behalf of Decedent, appellants argue that the written policies of respondent created a self-imposed duty to care for injured patrons on the premises. According to appellants, this duty encompassed the responsibility for calling an ambulance or the police and administering first aid to the plaintiff. Taco Bell's policies, contained in their administrative reference manual and posted first aid signs, direct employees to report all injuries and "get" first aid immediately. The administrative reference manual directs that managers should instruct their employees dur-

ing first aid training to avoid the unnecessary movement of injured persons.

Appellant analogizes the written policies of respondent to the fact situation in *Stanturf v. Sipes, supra.* In *Stanturf,* the court suggested that a private hospital which maintains an emergency room and has a custom of admitting all persons upon the payment of $25 dollars may create a situation in which people rely on that hospital's services, and this reliance, in turn, may create an implied duty of care by the hospital. *Id.* at 562. The Missouri Supreme Court held that summary judgment was not properly granted because a duty could be found, pending a full factual development at trial.

■ A fast food restaurant with posted safety rules is readily distinguishable from a private hospital that maintains an emergency room. Individuals do not enter restaurants relying upon their ability to provide emergency health care. Respondent corporation's safety policies are laudable and demonstrate respondent's concern for the care of injured customers, but we cannot suggest that the safety rule and procedures, by themselves, create a duty on the part of respondent corporation to insure the care of individuals who become ill or injured on their premises. To hold otherwise, would discourage the development of programs to properly deal with injuries or illnesses that occur on the premises of fast food restaurants.

In summary, the duty, if any, owed by respondent, arises from the voluntary affirmative actions undertaken to assist Decedent. We next address the issue of whether, as a matter of law, Manager was reasonable in the performance of his voluntary undertaking.

ment. *Id.* The activities include those naturally incident to a business. *Id.; McClure v. McIntosh,* 770 S.W.2d 406, 411 (Mo.App.1989). The record on appeal indicates that Manager was on duty at respondent corporation's restaurant on the night in question. Manager stated in his deposition that incident to his duty as a manager, he was to perform "manager walks" every fifteen to thirty minutes. These walks included the exterior of the building. When Manager

lifted Decedent from the ground and placed him on the patio bench, Manager was on respondent's premises and on duty. Whether Manager's actions taken on behalf of a patron who had fallen on respondent corporation's premises while Manager was in charge of respondent's restaurant were incident to Manager's employment is, under these circumstances, a question of fact to be resolved by the jury.

Appellants' second amended petition contained four counts. Counts one and two are based on theories of voluntary assumption of duty. Count three addresses the possible aggravation of Decedent's injuries, and count four alleges that respondent failed to maintain safe premises. We will address the fourth count first.

■ Appellants' fourth count alleges that a puddle of water on the patio of respondents' restaurant caused Decedent's fall. We have reviewed the entire record in this case and find no evidence whatsoever that Decedent's fall was due to a puddle of water. When Decedent first fell at 2:00 a.m. his feet did not slip out from under him. The only testimony available, given by Manager in his deposition, indicates that Decedent slid slowly down the wall and onto his side. Decedent's second fall at 3:45, described by Strong in his deposition, indicates that Decedent fell over to one side because he leaned too far in that direction. There was no indication that Decedent slipped, rather the only evidence available, now or ever, indicates that Decedent was passed out on his feet and fell over in a treelike fashion because of loss of balance and not from loss of footing. Decedent's third fall from the bench was unwitnessed but it stretches belief to the breaking point that a puddle of water could cause someone seated in Decedent's position with his arms on an adjacent table to fall. Therefore, we find as a matter of law that the puddle of water in no way caused Decedent's three falls, and affirm the trial court's ruling insofar as it dismisses the fourth count of appellants' second amended petition.[3]

Counts one and two concern the voluntary assumption of duty on the part of Manager and respondent corporation's vicarious liability as Manager's employer and count three addresses the possible negligence involved in aggravating Decedent's injuries. Viewed in the light most favorable to appellants, Manager was confronted with a situation where a drunken man had fallen hard onto the pavement. Decedent's head, according to Strong's version of the story contained in a police report made two months after the incident, may have been face down in a puddle of water. Strong also told the police officer that Decedent had asked to be helped up. The paramedics that attended Decedent the next morning reported a laceration on Decedent's head.

■ On the one hand, helping a highly intoxicated person who has fallen to a seated position may be reasonable depending on the circumstances. On the other, it is common knowledge that moving a seriously injured individual can exacerbate the injury. Additionally, placing an unconscious person on a bench may not be reasonable if it is likely he will fall off and injure himself. The role of this court is not to weigh the facts and draw our own conclusions but rather to determine whether genuine issues exist from which reasonable men could draw differing conclusions. We find that genuine issues do exist that would benefit from a full factual development at trial and resolution by a jury.

The judgment of the trial court is affirmed as to the fourth count of appellants' second amended petition and reversed and remanded for hearing on counts one, two and three.

CRANDALL, P.J., concurs.

GRIMM, J., concurs in result only.

---

3. This does not mean that the puddle of water could not have justified the movement of Decedent from the wall to the patio table after his second fall. Strong stated in a police report made two months after the incident that Decedent was face down in the water, which, if true, would justify the movement of Decedent out of the puddle. We merely hold that the puddle did not contribute to Decedent's falls, as alleged in appellants' fourth count, and express no opinion over whether the puddle justified moving Decedent.